[S. F. No. 3666. In Bank.—January 8, 1907.]

JOHN B. EARLE, Respondent, v. SUNNYSIDE LAND COMPANY, Appellant, and CALIFORNIA TITLE INSURANCE AND TRUST COMPANY et al., Respondents.

TRUST-DEED — CONSTRUCTION — PAYMENT OUT OF PROCEEDS OF LANDS SOLD—DILIGENCE OF LAND COMPANY—FORECLOSURE—FINDING OF NEGLIGENCE.—The provision in a trust-deed to secure creditors that they should be paid only out of the proceeds of sales by a land company party thereto, at not less than certain minimum prices,

is to be construed with its undertaking to use reasonable diligence in placing the lands upon the market and in making sales thereof, and the trust-deed cannot be construed as intending that the land company by violating its agreement could indefinitely postpone the right of the creditors secured to obtain payment out of the lands; and upon foreclosure by the creditors, where the court finds that the land company was negligent in its required duty to make sales, it will equitably subject the lands to the payment of the creditors by a judicial sale, without reference to the performance of the condition.

ID.—ABSENCE OF PERSONAL LIABILITY—"LIEN SECURITY."—The absence of the personal liability of the land company will not affect the foreclosure of the security, where by the terms of the instrument a "first-lien security" was provided for in favor of the trust company for the repayment of all advances by it; and the payment through it of unpaid purchase money due from the land company to its vendors was thereby secured.

ID.—PROVISION FOR "MINIMUM PRICES" — BENEFIT OF CREDITORS — POWER OF LAND COMPANY TO FIX PRICES NOT ARBITRARY.—The provision in the deed of trust for "minimum prices" was inserted for the benefit of the creditors secured, and is a restriction upon the right of the land company to sell at prices to be fixed by it according to its pleasure. Such right, however, is to be read with its covenant to use reasonable diligence to make sales, and in .the light of the general purposes of the trust agreement; and cannot be construed as an arbitrary and unfettered power to fix prices which would make sales impossible, and indefinitely prevent the accomplishment of the purposes of the trust.

ID. — SUBROGATION OF CREDITOR TO ORIGINAL MORTGAGE-LIEN — FORECLOSURE FOR RESIDUE—FIRST LIEN.—Where there was an original mortgage upon the lands sold to the land company, which a bank at the request of the land company had advanced the money to discharge, to which security it was agreed that the bank was subrogated and had a "first lien" upon the property, to the unpaid residue of which the plaintiff had succeeded, he is entitled by subrogation to enforce a "first lien" for the residue out of the unsold lands. His rights are unaffected by the fact that the security for the bank passed through the hands of the trust company.

ID.—VALIDITY OF TRUST—EQUITABLE LIEN—FORM OF SECURITY NOT MATERIAL.—Regardless of the question of the validity of the deed of trust under section 857 of the Civil Code, the instrument may be sustained as an equitable mortgage or lien in favor of the creditors secured, which is enforceable as such. The form of the writing is not important provided it sufficiently appears that it was thereby intended to create a security.

ID.—FORECLOSURE OF LIEN—SALES AT "MINIMUM PRICES" NOT REQUIRED—POWER OF COURT.—Upon the foreclosure of the equitable lien of the creditors the judgment is not required to direct that

the sale of the lands be made at the "minimum prices" set forth
in the trust agreement. That provision fell with the provision
authorizing the company to make the sales, when by reason of its
neglect to make sales the land company produced a condition which
authorized a court of equity to take the security into its own hands,
and the court was authorized to direct a sale in any just and
equitable manner.

ID.—CONSTRUCTION OF DECREE AS TO TRUST COMPANY—SUPPORT OF
FINDINGS.—Regarding the decree as an entirety, it is held to be
intended to provide that sums due to the trust company individ-
ually should be deducted from the total sum to be received by it as
trustee from the proceeds of judicial sales of the land, and to follow
the findings in that respect.

APPEAL from a judgment of the Superior Court of the
City and County of San Francisco and from an order denying
a new trial. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Mullany, Grant & Cushing, for Appellant.

Warren Olney, Jesse W. Lilienthal, Warren Olney, Jr.,
Page, McCutchen & Knight, Page, McCutchen, Harding &
Knight, James L. Crittenden, N. D. Anderson, E. S. Pillsbury,
Wm. H. Chapman, Maguire & Gallagher, Bishop & Wheeler,
Chas. S. Wheeler, Wilson & Wilson, Charles W. Willard, and
Edgar D. Peixotto, for Respondents.

SLOSS, J.—On January 5, 1891, Leland Stanford con-
veyed to James P. McCarthy a tract of land containing
589.03 acres, situate in the outskirts of the city of San Fran-
cisco. In consideration of the transfer McCarthy gave
Stanford four promissory notes, two for fifty thousand dollars
each and two for one hundred and twelve thousand five hun-
dred dollars each, and secured the payment of the notes by a
mortgage of the land conveyed.

On the first day of April, 1891, McCarthy conveyed to the
Sunnyside Land Company about two hundred acres of said
tract, the portion so conveyed being known as "The Sunny-
side." The consideration for this conveyance was the agree-
ment of the Sunnyside Land Company to pay four hundred
thousand dollars, one hundred thousand dollars of which was
paid in cash and three hundred thousand dollars was secured

by a mortgage upon the two hundred acres so conveyed. The Sunnyside Land Company thereupon had "The Sunnyside" surveyed and divided into blocks and lots, which were delineated upon a map of "The Sunnyside," filed in the recorder's office. On July 6, 1891, McCarthy conveyed to William M. Fitzhugh the undivided half of the indebtedness due him by the Sunnyside Land Company and of the mortgage given to secure the same. On the fifth day of February, 1892, there was executed by the Sunnyside Land Company, as party of the first part, James P. McCarthy and William M. Fitzhugh, as parties of the second part, and the California Title Insurance and Trust Company, as party of the third part, an instrument in writing, which is referred to in the record as "Trust No. One." Briefly stated, this agreement, certain provisions of which will be set forth more in detail hereafter, provided that the mortgage of three hundred thousand dollars, given by the Sunnyside Land Company to McCarthy was canceled, and all the lands embraced therein, excepting those which had been sold by the Sunnyside Land Company, were bargained, sold, and conveyed by the land company and by McCarthy and Fitzhugh to the California Title Insurance and Trust Company upon these trusts: That the Sunnyside Land Company should proceed with due diligence to make sales of said tract of land at such prices and upon such terms as it should deem advisable, but in no case under certain minimum prices which were set forth in the instrument, and when purchasers should be found, the said Title Insurance and Trust Company and the said Sunnyside Land Company should make a deed of the property sold, and the proceeds of the sales less seven and a half per cent thereof, which should be retained by the land company to cover the expenses of advertising and selling, should be received by the Title Insurance and Trust Company, and applied by it in payment of the Stanford mortgage, and then in payment of the balance due McCarthy and Fitzhugh on the canceled mortgage. After the payment of the foregoing amounts, together with certain expenses incidental to the discharge of the trust, reconveyance should be made to the Sunnyside Land Company of all the lands not sold. It was provided by this instrument, as it had been provided by the mortgage from the Sunnyside Land Company to McCarthy, that the land company should not be

required to make payment of any part of the moneys so owing by it from any source other than from sales of the said tract of land. The Title Insurance and Trust Company was authorized to make advances to pay claims affecting the property covered by the instrument, and was given a first lien security upon "The Sunnyside" for the repayment of all such advances, with interest. The Title Insurance and Trust Company, however, did not obligate itself to make such advances. The land company was given the option of making payments at any time from other sources than from sales.

On January 3, 1893, there was due and payable to Stanford $81,523.24 on account of one of the notes given by McCarthy. Stanford demanded payment of the amount due, and neither McCarthy nor Fitzhugh nor the Sunnyside Land Company was able to make payment. Under these circumstances the Title Insurance and Trust Company, and certain other persons interested, agreed to advance $31,523.24, and the Title Insurance and Trust Company, at the request of the Sunnyside Land Company, McCarthy, and Fitzhugh, induced Wells, Fargo & Company to advance fifty thousand dollars, making the $81,523.24 required to discharge the Stanford indebtedness. At the time of the advance of the fifty thousand dollars by Wells, Fargo & Company, an agreement was entered into by the Sunnyside Land Company, as party of the first part, Wells, Fargo & Company as party of the second part, California Title Insurance and Trust Company as party of the third part, McCarthy and Fitzhugh as parties of the fourth part, and the Stanford Addition Land Company (successor in interest of McCarthy and Fitzhugh in part of the lands purchased by McCarthy) as party of the fifth part. This instrument provided that in consideration of the advance by Wells, Fargo & Company, the Sunnyside Land Company agreed to pay Wells, Fargo & Company or order the sum of fifty thousand dollars within three months, with interest at the rate of ten per cent per annum, and further agreed that the said fifty thousand dollars should be used to discharge the lien of the Stanford mortgage as to "The Sunnyside," and that Wells, Fargo & Company should be subrogated to the rights of Stanford under the said mortgage, and should have the first lien upon said real property, and upon all property and proceeds of the securities and evidences of debt received by

the California Title Insurance and Trust Company under Trust No. One. The Sunnyside Land Company executed its promissory note to Wells, Fargo & Company for fifty thousand dollars, in accordance with this agreement. Wells, Fargo & Company paid Stanford the said fifty thousand dollars, and Stanford released the lien of his mortgage upon "The Sunnyside."

Thereafter sales were made of lands belonging to the Sunnyside Land Company in accordance with the provisions of Trust No. One, and from the proceeds of these sales payments were made to Wells, Fargo & Company until, on March 29, 1897, the balance due was reduced from fifty thousand dollars to fifteen thousand nine hundred dollars. At that time Wells, Fargo & Company was insisting upon payment, and threatening a foreclosure under its agreement of January 3, 1893, and in order to prevent such foreclosure suit, at the request of the Sunnyside Land Company, the California Title Insurance and Trust Company paid Wells, Fargo & Company said fifteen thousand nine hundred dollars, and took from Wells, Fargo & Company an assignment of the indebtedness due under the agreement of January 3, 1893. This indebtedness was then evidenced by a new note of the Sunnyside Land Company to Wells, Fargo & Company. On October 12, 1899, the California Title Insurance and Trust Company executed an instrument transferring and assigning to the Anglo-Californian Bank, Limited, said claim (and note) for fifteen thousand nine hundred dollars, together with the security agreement of January 3, 1893, and on the 8th of November, 1899, the Anglo-Californian Bank transferred this claim, note, and agreement to John B. Earle, the plaintiff in this action.

The plaintiff instituted this action on November 13, 1899, alleging substantially the foregoing facts, and sought to recover the sum of fifteen thousand nine hundred dollars with interest, and to foreclose his lien on so much of "The Sunnyside" as had not been sold to *bona fide* purchasers. The complaint named as defendants the Sunnyside Land Company, California Title Insurance and Trust Company, and a number of other persons who are alleged to claim some interest in the land. All of these other parties derive whatever interest they may have from McCarthy and Fitzhugh.

The California Title Insurance and Trust Company appeared and filed a cross-complaint in which, in addition to showing the transactions hereinabove stated, it set out in full the instrument described as Trust No. One. It may be well at this point to state more fully some of the provisions of that instrument. Paragraph 5 reads as follows: "It is further provided that the said party of the first part (Sunnyside Land Company) shall be entitled to make payments in any amount to said party of the third part (California Title Insurance and Trust Company) on account of the indebtedness hereby secured to be paid and to have said payments applied toward the release of such hereinabove described lands, as said party of the first part may designate, from the lien of said mortgage to Leland Stanford; but it is understood that the sum hereby secured to be paid shall be and is to be paid (except under the said option) only from the proceeds of the sales made by the said party of the first part of the lands hereinabove described, and that said parties of the second and third parts will not require the payment thereof from any other source. The said party of the first part, however, agrees to use reasonable diligence in placing said lands upon the market and in making sales thereof in subdivisions of lots or blocks as said lots and blocks are delineated and designated upon a certain map entitled 'Sunnyside,' owned by the Sunnyside Land Company, and filed in the office of the recorder of said city and county, on the 6th day of April, 1891, such sales to be by it made at such prices and upon such terms as it may deem beneficial and profitable, but at prices not less per block than those designated in the hereinafter mentioned 'Schedule B.'. . . ." Paragraph 10 reads: "In case the said party of the third part shall at any time advance, or cause to be advanced by any person or persons or corporation sums of money for the purpose of making payments upon the said mortgage to Leland Stanford, or to any other person or persons or corporation to whom the said party of the third part is hereby directed or permitted to make payments of money, such payments out of the money so advanced shall, except where herein otherwise provided, be deemed to have been made for the benefit of the said parties of the second part (McCarthy and Fitzhugh) and the said party of the third part shall as between the said parties of the second and

third part, immediately become subrogated *pro tanto* to all the rights and privileges of the said party of the second part under this deed and assignment of trust; and this deed and assignment of trust shall be and constitute, as between the said parties of the second and third parts, a first lien security in favor of said party of the third part for the repayment of all such advances, together with interest thereon at the rate of 9 per cent per annum." In addition it may be noted that paragraph 2 of the instrument provides that "this deed and assignment of trust is made to secure the payment, as herein provided, to the said parties of the second part of the sum of $226,742.76, together with accrued interest. . . ."

The cross-complaint of the California Title Insurance and Trust Company alleges that at the time of filing the cross-complaint there remained unpaid and due from the Sunnyside Land Company to the cross-complainant, as trustee on account of the principal sum secured to be paid by said Trust No. One, the sum of $111,198.63, together with the sum of $36,552.17 for interest. It alleges further that the said Sunnyside Land Company "has at all times failed and neglected to use reasonable, or any diligence in placing the lands herein designated as 'The Sunnyside' upon the market, and making sales thereof in subdivisions of lots or blocks, as said lots and blocks are delineated and designated upon such map of Sunnyside or any other subdivisions or at all." The cross-complaint asks for a decree that the property be sold to pay the amounts due the cross-complainant under the trust-deed.

The answers of the Sunnyside Land Company to the complaint and the cross-complaint raise no material issue that need here be considered beyond the denial of the allegation of the cross-complaint that the land company had failed and neglected to use reasonable or any diligence in making sales of the lands.

After a trial the court made its findings of fact, in which it found, among other things, that "said Sunnyside Land Company has at all times since the execution of said Trust No. One failed and neglected to use reasonable or any diligence, in placing the lands herein designated as 'The Sunnyside' upon the market and in making sales thereof in subdivisions of lots or blocks, as said lots and blocks are delineated and designated upon the said map of 'Sunnyside,' or any

other subdivisions, or at all," and that "the prices which said Sunnyside Land Company placed and maintained on the unsold and unconveyed lots in said Sunnyside tract, and which it sought and tried to obtain for the same after the execution of said Trust No. One, were and are excessive and prohibitory, and were and are largely in excess of the prices that were obtainable in the open market, and largely in excess of the minimum selling price set forth in 'Schedule B' annexed to said Trust No. One."

Upon the findings the court made its decree, in which it decreed that there was due the plaintiff from the Sunnyside Land Company upon the promissory note of March 26, 1897, for principal, interest, and attorneys' fees the sum of $21,-608.64, which, with plaintiff's costs, constituted a first lien upon the lands described in the complaint; that there was due the California Title Insurance and Trust Company, as trustee, from the Sunnyside Land Company for principal and interest secured to be paid by the instrument known as Trust No. One, the sum of $165,627.71, which constituted a valid lien upon said lands and premises; that said lands, or so much thereof as might be sufficient to raise the sums declared to be due the plaintiff and cross-complainant, together with interest thereon and costs subsequently accruing, be sold at public auction in the manner prescribed by the law on foreclosure of mortgages by a commissioner appointed by the court, and that the commissioner, after the expiration of the time for redemption, execute a deed or deeds to the purchaser or purchasers at said sale, and that the commissioner out of the proceeds of said sale, after retaining his commissions and disbursements, pay first to the cross-complainant, California Title Insurance and Trust Company, the amount sufficient to redeem the said lands from all tax-sales to the state; second, that said commissioner out of said proceeds pay to the plaintiff the sums declared to be due to said plaintiff, and, third, that said commissioner pay to the cross-complainant, California Title Insurance and Trust Company, the balance of the sums declared to be due to it as trustee from said Sunnyside Land Company under said Trust No. One. Any surplus remaining is directed to be paid to the defendant, the Sunnyside Land Company. The decree then goes on to designate the amounts due to the California Title Insurance and Trust Company

individually, and payable out of the amount to be received by it, and decrees that the defendants other than the Sunnyside Land Company and the California Title Insurance and Trust Company have no interest in the lands except such right as they may have in moneys received by the California Title Insurance and Trust Company as trustee for them.

The Sunnyside Land Company made a motion for a new trial, which was denied, and now appeals from the judgment and from the order denying its motion for a new trial.

While the transactions which gave rise to this controversy are somewhat involved and complicated, the questions to be considered upon these appeals are neither numerous nor difficult. The principal contention of the Sunnyside Land Company is based upon the provision found in Trust No. One to the effect that the sum secured to be paid is to be paid only from the proceeds of sales made by said land company of the lands covered by the trust-deed, and that the other parties to the instrument will not require the payment thereof from any other source. From this provision it is argued that the respondents—i. e. the plaintiff and the California Title Insurance and Trust Company—agreed to look for their payment only to the proceeds of such sales to be made by the Sunnyside Land Company, and that they have no right to seek or enforce payment in any other way. But we think that this argument is based upon too narrow a construction of the provisions of paragraph 5 of the trust-deed. That paragraph provides in addition to the agreement that the payment of the sums due is not to be required from any other source than sales of lands, the undertaking that the Sunnyside Land Company is to use reasonable diligence in placing said lands upon the market and in making sales thereof, such sales to be by it made at such prices and upon such terms as it may deem beneficial and profitable, but at prices not less per block than those designated in a schedule attached to the deed. These provisions are all to be read together, and it certainly could not have been the intention of the parties that the Sunnyside Land Company should, by violating its agreement to use reasonable diligence in making sales, have the power to indefinitely or perpetually postpone the right of the creditors to obtain payment of their claims out of the land which was by the deed of trust made security, and the

only security, for such claims. The cross-complainant alleged and the court found that the Sunnyside Land Company had failed to use reasonable diligence in making sales of these lands. This finding is attacked by the appellant as unsustained by the evidence. We do not intend to restate or even to summarize the many pages of testimony appearing in the transcript upon both sides of this question, but shall content ourselves with saying that, in our judgment, the evidence was ample to support the finding. This being so, can it be said that paragraph 5 of the deed of trust contemplated that the party of the first part, which had agreed to use reasonable diligence in selling these lands, could violate this clause of the agreement, and still stand upon the connected clause providing that no payments were to be made except out of its sales? The case presents a close analogy in principle to the decisions holding that where there is an agreement to pay a sum of money out of the proceeds of a particular fund to be realized by some act of the party who is to make the payment, the act must be performed by him within a reasonable time, and if he fails to perform this duty the sum is payable without reference to the performance of the condition. In *Sears* v. *Wright,* 24 Me. 278, the action was brought upon the defendant's agreement to pay a certain sum of money from "the avails of the logs bought of Martin Mower, when there is a sale made." It was contended that as the logs had not been sold there was no obligation, but the court, finding that a reasonable time for a sale had elapsed, refused to recognize the defense, saying: "By the terms of that contract it could not be inferred, that the plaintiff had consented to subject himself to any such contingency. His agreement in terms was to wait till the logs could be sold. Thus the defendants had a duty to perform. They were bound to sell the logs and do it within a reasonable time. A reasonable time for such purpose had long since elapsed." In *Nunez* v. *Dautel,* 19 Wall. 560, the action was upon obligations promising to pay "as soon as the crop can be sold or the money raised from any other source." The suit was instituted more than five years after the date of the instrument. It was held that the plaintiff was entitled to recover without proof that the crops had been sold or the money raised from any other source, the court saying: "No time having been specified within which the crops should

be sold or the money raised otherwise, the law annexed as an incident that one or the other should be done within a reasonable time, and that the sum admitted to be due should be paid accordingly. Payment was not conditional to the extent of depending wholly and finally upon the alternatives mentioned. The stipulation secured to the defendants a reasonable amount of time within which to procure in one mode or the other the means necessary to meet the liability. Upon the occurrence of either of the events named or the lapse of such time, the debt became due. It could not have been the intention of the parties that if the crop were destroyed, or from any other cause could never be sold, and the defendants could not procure the money from any other source the debt should never be paid. Such a result would be a mockery of justice. . . . When the suit was instituted more than five years had elapsed from the date of the instrument. This was much more than a reasonable time for the fulfillment of the undertaking of the defendants, and the plaintiff was entitled to recover.". In *Williston* v. *Perkins,* 51 Cal. 554, the defendants, who were engaged in building a vessel, gave to their laborers certificates providing that the payees were entitled to receive specified sums, "when the three-masted schooner now in course of construction by said association is sold." Action was brought upon these certificates before the vessel had been sold. The trial court found that the defendants did not make an honest effort to sell the vessel at its market value and gave judgment for the plaintiff. The judgment was affirmed on appeal, the court saying: "The defendants were entitled to only reasonable time in which to finish and sell the schooner, and that time having elapsed, the plaintiff could maintain his action." (See, also, *Bryant* v. *Saling,* 4 Mo. 522; *Ubsdell* v. *Cunningham,* 22 Mo. 124; *Hicks* v. *Shouse,* 17 B. Mon. (Ky.) 483; *Wilder* v. *Sprague,* 50 Me. 354; *DeWolfe* v. *French,* 51 Me. 420; *Crocker* v. *Holmes,* 65 Me. 195, [20 Am. Rep. 687]; *Noland* v. *Bull,* 24 Or. 485, [33 Pac. 983].)

In nearly all of these cases the literal reading of the contract was merely that the payment should be made upon the sale of certain property or the performance of some act by the defendant. The court, however, in each instance had no difficulty in reading into the contract an obligation on the

CL Cal.—15

part of the defendant to use reasonable diligence to perform the act, upon the completion of which the payment was made contingent, and in the event of his failure so to do in requiring payment without the performance of the condition. The present case is stronger than any of those cited in that here the Sunnyside Land Company agrees in terms to use reasonable diligence in placing said lands upon the market and in making sales thereof.

It is true that this case differs from those cited in that here, under the express provisions of Trust No. One, a personal liability could not be imposed upon the Sunnyside Land Company. Nor was it attempted to impose such liability. But by the instrument in question the "deed and assignment of trust" was made a "first lien security" in favor of the Title Insurance and Trust Company for the repayment of all advances, and was also made to secure the payment to McCarthy and Fitzhugh, through the title company, of the purchase price not yet received by them. The payment of these sums being thus secured by the land, we are satisfied that upon the failure of the land company to use the required diligence to make sales, a court of equity was authorized to subject the security to the payment of the claims of the plaintiffs and the cross-complainant by some appropriate method, such as the method here adopted.

The appellant lays much stress upon the provision in paragraph 5 of the deed of trust that sales are to be made by it at such prices and upon such terms as it may deem beneficial and profitable, but at prices not less per block than those designated in the schedule. The provision for minimum prices is no doubt inserted for the protection of the parties other than the Sunnyside Land Company. It is a restriction upon the right of the land company to fix prices according to its pleasure. But it is not the only restriction on this right. The clause giving the right to fix prices must be read in connection with the covenant to use reasonable diligence to make sales, and in the light of the general purpose of the trust agreement. The object which the parties had in view was that the lands should be disposed of to the ends—1. That the claims against the lands should be discharged; and 2. That the land company should realize a profit either in money or in lands remaining unsold after payment of the indebtedness. It was

never intended that the Sunnyside Land Company should have an arbitrary and unfettered power to fix prices which would make any sales impossible and would for an indefinite time prevent the accomplishment of the purposes of the trust.

In this discussion we have treated the plaintiff's case and that of the California Title Insurance and Trust Company as standing on the same grounds—viz. that both are based on claims secured by the terms of Trust No. One.    But, so far as the plaintiff is concerned, the relief granted by the decree finds other support.    The plaintiff is the assignee of the agreement of January 3, 1893, under which Wells, Fargo & Company made an advance of fifty thousand dollars.    In this agreement the Sunnyside Land Company stipulated that Wells, Fargo & Company should be subrogated to the rights of Stanford under the original mortgage.    The plaintiff, as the holder of a part of the indebtedness, and assignee of the agreement, succeeded to this right of subrogation, and is, by virtue of it, entitled to a decree of foreclosure.    His rights are in no wise affected by the fact that the Wells, Fargo & Company note passed through the hands of the California Title Insurance and Trust Company.    There was nothing in the relations of trust created by "Trust No. One" which prevented the title company from advancing the money required to pay off Wells, Fargo & Company, and taking the security which had been held by Wells, Fargo & Company. The advance was made to prevent a threatened foreclosure, and in making it the title company was not required to surrender any part of the security for the claim assigned to it.

It is argued by the appellant that the instrument known as Trust No. One attempts to create a trust for purposes not authorized by section 857 of the Civil Code, and that for that reason the entire instrument is void.    We do not think it necessary in this case to determine whether the instrument in question was a valid trust-deed so as to convey the legal title to the California Title Insurance and Trust Company.    If it was not a valid trust-deed, there can be no difficulty in sustaining the instrument as an equitable mortgage or lien.    As this court has said, in *Higgins* v. *Manson,* 126 Cal. 467, [77 Am. St. Rep. 192, 58 Pac. 907], quoting the rule as stated in *Howard* v. *Iron etc. Co.,* 62 Minn. 298, [64 N. W. 896], "Every express agreement in writing whereby the party

clearly indicates an intention to make some particular property therein described a security for a debt, creates an equitable lien upon the property, which is enforceable. The form of the writing is not important, provided it sufficiently appears that it was thereby intended to create a security. If that intention appears, it will create a mortgage in equity or a specific lien upon the property so intended to be mortgaged.'' In a case like this where the parties have entered into a written agreement, of whatever form, intended to make certain property a security for past indebtedness and for future advances, and have acted upon the faith of that agreement in making and accepting such further advances, we should be slow to adopt any construction which would result in invalidating the entire transaction and depriving the creditor who has advanced his money in good faith of any remedy for its recovery. No policy of the law is violated by treating this instrument as creating a lien in the nature of a mortgage, if it cannot be upheld as a deed of trust. Whether it be the one or the other, we do not doubt the power of a court of equity to direct the sale of the security for the discharge of the debt, at least where the instrument itself furnishes no available method of realizing on the security.

We cannot agree with the contention of the appellant that the judgment should have directed that the sales be made at figures not less than the minimum prices set forth in the trust agreement. This provision for minimum sales was, as we have said, inserted for the benefit of the creditors. Furthermore, it was a part and parcel of the general scheme for the sale of the lands by the Sunnyside Land Company itself. When, by reason of its neglect to perform its duty, the Sunnyside Land Company produced a condition which authorized a court of equity to take the security into its hands for the purpose of realizing the sums for which it was liable, the provision for minimum prices fell with the provision authorizing the land company to make the sales, and the court was authorized to direct a sale in any just and equitable manner. We see no objection to the manner that is here adopted.

The point is made that the judgment does not follow the findings in that it authorizes payment to the California Title Insurance and Trust Company of amounts due to it individually, in addition to the sum of $165,627.71, payable to it as

trustee. Reading the decree as an entirety, there can be no question that it intended to provide and did provide that the sums due to the California Title Insurance and Trust Company individually should be deducted from the total sum of $165,627.71 to be received by it from the proceeds of the sales.

We find no prejudicial error in any rulings made by the court upon the admission or rejection of evidence, nor is any other point made by the appellants that requires notice.

The judgment and order appealed from are affirmed.

Angellotti, J., Shaw, J., McFarland, J., and Lorigan, J., concurred.